**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| LEDUC A. OBAS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No.    1:08-cv-505 |
| | ) |            CMH/JFA |
| | ) | |
| MICHAEL MUKASEY, | ) | |
| Attorney General of the United States, | ) | |
|     Defendant. | ) | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL DISMISSAL, AND FOR SUMMARY JUDGMENT</u>

The Defendant, Michael Mukasey, Attorney General of the United States,[1] through the undersigned attorneys, moves this Court to dismiss this action in part, and to grant summary judgment with respect to the remainder of the claims.

## <u>INTRODUCTION</u>

The plaintiff in this Title VII action, Special Agent (S/A) Leduc Obas ("Obas"), alleges that he was not selected for a vacant position because of his Haitian national origin, and instead was passed over for the position in lieu of another qualified applicant, who happened to be Jamaican American. Obas also states that he is bringing his lawsuit under the anti-retaliation provisions of Title VII, though he never raised such a claim in the administrative process. As was made clear in the administrative process, Obas has

---

[1] Though the plaintiff has properly named the Attorney General as the nominal defendant in this case, 42 U.S.C. § 2000e-16(c), the real party in interest is the plaintiff's employer, the Drug Enforcement Administration. This memorandum will therefore refer to the defendant as "the DEA."

nothing to support his claims but his own bald allegations that he had more experience and was thus better-qualified than the ultimate selectee.  Obas cannot dispute, however, that the year prior to the non-selection, he had been disciplined for fighting with another special agent, and for this reason Obas's supervisor, Special Agent in Charge ("SAC") Jerome Harris, declined to recommend Obas for the vacant position.  Nor can Obas dispute that a diverse body of senior DEA officials (known as the Career Board) reviewed the qualifications and work history of all qualified applicants for the position and found the selectee to be the best applicant.  And finally, Obas cannot dispute that the DEA official who made the ultimate selection decision, DEA Deputy Administrator Michele Leonhart, did not even know Obas's national origin when she acted on the Career Board's recommendation and selected who she believed to be the best-qualified applicant for the position.

The administrative record in this matter is extensive, and the case is ripe for summary judgment.  At the outset, Obas never raised a race discrimination or retaliation claim during the administrative process.   Because Obas did not exhaust his administrative remedies with respect to these claims, he is barred from raising them here. With respect to Obas's national origin claim, there is no evidence that would allow him to prevail if this case were tried to a jury.  Obas cannot rebut the DEA's legitimate, non-discriminatory reasons for its actions.  Specifically, Obas cannot rebut SAC Harris's testimony that he declined to recommend Obas because of the fighting incident.  Nor can Obas rebut the testimony from the Career Board members, and from the Deputy

2

Administrator, that they believed the ultimate selectee was the best-qualified applicant for the job.  For these reasons, which are described in detail below, the Court should grant summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

At all times relevant to this action, Obas was a GS-13 Criminal Investigator in the DEA's Caribbean Division, Foreign Operations Group, in San Juan, Puerto Rico. Government Exhibit ("Govt. Exh.") Govt. Exh. 1, Att. B; Govt Exh. 3, p. 8; Govt. Exh. 4, p. 2; *see also* Govt. Exh. 2.  Obas states that his national origin is Haitian-American. Govt. Exh. 3, p. 8; Complaint, p. 3.  In 2004, Obas applied for a vacant GS-14 position in the Caribbean Division, but was passed over for that job in lieu of another GS-13 Special Agent (who claims to be African American, but who Obas alleges is of Jamaican-American national origin).  Govt. Exh. 1, Att. A-F; Govt. Exh. 3, p. 32.

### BACKGROUND: PROMOTIONS TO GS-14 AND GS-15 AT THE DEA

For DEA special agents, all decisions regarding selections for vacancies at the GS-14 or GS-15 level, and regarding promotions to the GS-14 or GS-15 level, are made by the Career Board, which is a body of senior DEA officials from DEA headquarters and various field offices.  Govt. Exh. 1, p. 2; Govt. Exh. 9.  The president of the Career Board is the DEA Deputy Administrator, who serves as the selecting official for all the employment decisions before the Career Board.  Govt. Exh. 1, p. 2; Govt. Exh. 9.  The standing Career Board members include the Chief of Operations, the Chief Inspector, the Chief of Intelligence, the Assistant Administrator for Operational Support, and the

Assistant Administrator for Human Resources. *Id.*; Govt. Exh. 1, pp. 2-3. Senior DEA officials from the field divisions (usually Special Agents in Charge) serve on the Career Board on a rotating basis as well. *Id.*, p. 3.

For each vacancy, the Career Board recommends an applicant from the "best-qualified list" (or "BQL"), a list of special agents who have applied for the position and who have been deemed qualified by virtue of their score on the Special Agent Promotion Program (or "SAPP").[6] Govt. Exh. 1, pp. 3-4; Govt. Exh. 1, Att. A, p. 1; Govt. Exh. 15. In selecting an applicant from the BQL, the Career Board members have access to two sources of information. First, they have a biographical data sheet for each applicant; the sheet is prepared by the Career Board staff and contains a list of each applicant's assignments, performance and training history, and a description of any unique knowledge, skills and abilities the agent may have (e.g., foreign language fluency). Govt. Exh. 1, p. 4. Second, the Career Board members consider a recommendation memo from the SAC whose office has the vacancy that is being filled. *Id.* In the recommendation memo (sometimes called the "short list"), the SAC lists his or her top recommendations as to which candidate from the BQL should be selected for the position, and describes each candidate's experience and competencies in light of eight job-related criteria. Govt.

---

6 An applicant's SAPP score is determined by two components. Govt. Exh. 15, p. 3. The first is the applicant's promotion rating scales, in which the applicant's supervisor rates the applicant on various competencies that are needed for success performance in positions at the next higher grade. *Id.* The second is the applicant's score at the assessment center, at which applicants undergo exercises that test the extent to which they have the knowledge and abilities to advance to the next higher grade. *Id.* An applicant's SAPP score determines only whether he or she makes the best qualified list; the score is not made known to and is not considered by the Career

Exh. 1, Att. E.  These criteria are: directing enforcement and/or investigative-related programs or other appropriate managerial experience in a law enforcement setting; managing, motivating, mentoring, and training subordinates; working in a team environment of mutual cooperation and assistance; working individually, displaying appropriate initiative  as necessary; managing agency resources; building and maintaining coalitions with other persons and entities, both internal and external to the agency; acquiring and possessing technical knowledge, education, special skills, or training peculiar to or required by the position; and possessing certain personal characteristics, traits, or attributes that make him better suited for the position under consideration.  *Id.*

For each vacancy, the Career Board members consider every candidate on the BQL (not only those listed in the SAC recommendation memo).  Govt. 8, p. 2; Govt. Exh. 9, p. 1.  The Career Board members vote and make a recommendation to the Deputy Administrator, who makes the ultimate selection.  Govt. Exh. 1, p. 2; Govt. Exh. 9, p. 1.

### <u>VACANCY NO. CMB-04-283-2</u>

On October 1, 2004, DEA issued Vacancy Announcement Number CMB-04-283-2, which announced that DEA was seeking applicants for a Criminal Investigator/Group Supervisor, GS-1811-14 position in the Puerto Rico Country Office.  Govt. Exh. 1, Att. A.  Obas submitted an application on October 4, 2004.  Govt. Exh. 1, Att. B.

Consistent with DEA's selection process procedures, the Human Resources Division (HR) at DEA Headquarters in Arlington, Virginia, prepared a Best Qualified List (BQL)

---

Board.  Govt. Exh. 15, p. 9.

listing, in alphabetical order, those applicants who met the necessary minimum qualifications.  Govt. Exh. 1, Att. C.  Obas was included on this list.  *Id.*  HR then forwarded the BQL, along with the applicants' career biographies, to the Career Board.

Before the Career Board met to deliberate its selection for this vacancy, it forwarded the BQL and application packages to SAC Jerome Harris, Caribbean Division, for his recommendation.  Govt. Exh. 1; Govt. Exh. 7, p. 4.  As the head of the office where the vacancy existed, Harris was responsible for providing the Career Board with a detailed memorandum, outlining his top recommended BQL candidates.  *Id.*  Assistant Special Agent in Charge (ASAC) Jay Bergman interviewed all BQL applicants and their supervisors, and compiled data from those discussions for Harris.  Govt. Exh. 7, p. 4.  After consulting with all BQL candidates' supervising SACs, Harris recommended, in order of preference, S/A Michael Dinnall (who lists his national origin as African American, but who Obas insists is Jamaican-American) and S/A Eric Friedman (Caucasian) for the position in a memorandum dated December 7, 2004.  Govt. Exh. 1, Att. E.  Harris did not recommend Obas.  *Id.*

With respect to Dinnall, the top-recommended candidate for the position, Harris wrote that Dinnall had been in law enforcement for twelve years (serving nine years in the DEA and three years as a Counterintelligence Agent with the U.S. Army); had served as backup Country Attaché for the Kingston, Jamaica Country Office (CO) for three years; had strong leadership skills and abilities; and had redirected the Kingston CO's "investigative priorities towards conducting Priority Target, long term, and wire intercept investigations

against major narcotics trafficking and money laundering organizations." Govt. Exh. 1, Att. E, pp. 1-4. According to Harris, these investigations resulted in the initiation of several spin-off investigations in domestic and foreign DEA offices. *Id.*, pp. 3-4. Harris stated that Dinnall had developed close working relationships with other offices, the Jamaica Constabulary Force, and the Jamaican government, and had acted as the liaison officer in Jamaica, interacting with senior U.S. and Jamaican government officials. *Id.*, pp. 3-4. Harris described Dinnall as a role model for other agents and personnel, a lecturer at the Jamaican Regional Drug Law Enforcement Training Center, a well-rounded agent, and a potential supervisor. *Id.* Further, Dinnall had received an "Outstanding" performance rating for the 2003 rating period. *Id.*, p. 1.

Though Harris was not required to address all the BQL candidates' applications in making his recommendations, nor was he required to outline the specific reasons why he would not recommend certain applicants, Harris later testified (via affidavit) that he did not recommend Obas because some months before the selection, Obas had been disciplined (specifically, he received a letter of reprimand) for fighting on duty.[7] Govt. Exh. 6, p. 2; Govt. Exh. 4, p. 3. Harris was Obas's SAC at the time the altercation occurred, and was thus familiar with the facts surrounding it. *Id.* The incident occurred in the presence of a host nation counterpart, causing DEA embarrassment. *Id.* Harris had wanted Obas "to develop leadership through positive actions and behavior," and believed

---

7 Obas does not dispute that he engaged in the fight, although Obas asserts that he was attacked by the other agent. See Govt. Exh. 3, pp. 58-62.

that it was inappropriate to recommend Obas for a supervisory position when his

misconduct had occurred on duty.  Harris indicated that he "would not support the

selection of any special agent who engaged in this type of behavior," adding that he did

not "consider fighting on the job appropriate behavior for any employee."[8]  *Id.*

The Career Board filled this vacancy – and over 100 other promotion and assignment

decisions – at its December 15, 2004 meeting.  Govt. Exh. 1, p. 3; Govt. Exh. 1, Att. E.

In deliberating, and consistent with its procedures, the Career Board considered all

applicants identified on the BQL, including plaintiff.  Govt. Exh. 9, p. 1.  The Career

Board members had before them all BQL-listed applicants' biographical data sheets and

Harris's recommendation memo.[9]  Govt. Exh. 1, p. 4; *see also* Govt. Exhs. 6, 10-14,

Career Board members' affidavits.  Ultimately, they concluded that Dinnall was the best-

---

8  There is some reference in the administrative record to Obas being the subject of an investigation by DEA's Office of Professional Responsibility (OPR) arising from the fighting incident.  *See* Govt. Exh. 6, p. 2.  But Harris clarified in his affidavit that it was the fighting incident itself, not the fact that Obas may or may not have been under investigation for it, that influenced his recommendation decision.  *Id.*  Moreover, the Career Board members are never informed as to whether any of the applicants are under investigation by OPR.  Govt. Exh. 9, p. 3.  According to Career Board Executive Secretary Heard, "OPR matters involving any DEA employee are not discussed at the Career Board Meetings.  This is extremely confidential information and access to this information is very limited."  However, after Career Board meetings: "the names of tentative selectees are vetted through a number of offices, including OPR.  If there is any potentially derogatory information identified, such as a pending OPR matter, that information is brought to [the] attention [of] the Deputy Administrator and Chairman of the Career Board.  [She] decides whether that information disqualifies the individual for the position for which he or she was selected.  Because Obas was not selected for the position, his name would not have gone through this vetting process."  Govt. Exh. 8, pp. 2-3.
9  The applicants' national origins are not identified in any of the materials that the Career Board considered.  Govt. Exh. 9, p. 2.  Further, Executive Secretary Jerry Heard, Deputy Administrator Leonhart, and Career Board members Guevara and Braun stated in their affidavits that that they had no knowledge, nor were aware or informed, of applicants' national origins prior to or during their December 15 meeting.  *See* Govt. Exhs. 8, 9, 12, and 13.

qualified applicant for the position.  Govt. Exhs. 6, 10-14.  None of the Career Board members voted to select Obas for the position.  *Id*.

The Career Board recommended Dinnall to Deputy Administrator Leonhart, who also serves as the Board Chairperson and makes final selection decisions.  Govt. Exh. 9, pp. 1-2.  Leonhart concurred with the Career Board's recommendation, and selected Dinnall for promotion to the position.  *Id.*  She and the Board considered Harris's recommendation significant because the vacancy was in his division and he "would have been very familiar with [Dinnall and Obas] and their qualifications for the position," since they both served in his division.  Govt. Exh. 9, pp. 2-3.  Further, Leonhart viewed Dinnall's experience as backup Country Attaché as an advantage because it meant that he was familiar with drug law enforcement in the Caribbean.  *Id.*, pp. 2-3.  Pursuant to normal DEA practice, the Career Board meeting minutes (which included Dinnall's selection) were published, announcing Dinnall's selection for the position.  Govt. Exh. 1, Att. D.

### OBAS'S ADMINISTRATIVE EEO COMPLAINT

Obas timely contacted an EEO counselor, and filed a formal complaint of discrimination on January 20, 2005.  Govt. Exh. 16.  The form contained several blocks for an aggrieved employee to check to indicate the basis for his or her complaint.  *Id.*  Obas "checked" only the block marked "national origin," and wrote next to the block "Haitian."  *Id.*  Obas left the other blocks blank, including the blocks marked "race or color" and "reprisal."  *Id.*  After an investigation into Obas's allegations conducted by a

senior investigator at a contract investigative firm, the DEA issued a report of investigation (ROI) that yielded no finding of discrimination.  Govt. Exh. 17. Disappointed, Obas requested that his case be heard by an Administrative Judge (AJ) of the Equal Employment Opportunity Commission (EEOC), who granted the DEA summary judgment.  Complaint, p. 12.  The DEA adopted the AJ's decision, and issued its final agency decision (FAD) on November 7, 2007.  Complaint, p. 11.  This civil action followed.

## DISCUSSION

### I.   FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Obas's judicial complaint arguably asserts allegations of race discrimination and retaliation.  Obas does not assert anywhere in his factual allegations that DEA officials retaliated against him, but he cites as one of the jurisdictional bases for his lawsuit Title VII's anti-retaliation provision.  Complaint, pp. 1-2, ¶ 2.  Obas also states that Title VII's race discrimination provision confers jurisdiction.  Complaint, p. 1, ¶ 1.  Further, in Count I of his complaint (asserting national origin discrimination), Obas makes a passing reference to the DEA's "race based conduct."  Complaint, p. 7, ¶ 34.   Thus, it is unclear whether Obas intends to assert race discrimination and retaliation (in addition to national origin discrimination) as bases for his lawsuit.  If he does, then the Court should dismiss those claims for failure to exhaust administrative remedies, because these claims were not raised or investigated in the administrative process.

It is well settled that before filing an employment discrimination lawsuit in court, a federal employee must timely pursue and exhaust all available administrative remedies. *Brown v. General Services Administration*, 425 U.S. 820, 832 (1976). The Equal Employment Opportunity Commission ("EEOC") has promulgated regulations for the acceptance and processing of discrimination complaints in federal employment. *See* 29 C.F.R. §§ 1614.104-1614.110 (detailing administrative processing of and time limits for bringing federal Title VII complaints).

These rules are not mere technicalities, but integral parts of Congress's statutory scheme of achieving a "careful blend of administrative and judicial enforcement powers." *Brown*, 425 U.S. at 833. If a plaintiff has failed to comply with any of these time limits with respect to a claim, he may not pursue that claim in federal court. *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 968-69 (4th Cir. 1985). The Supreme Court has consistently upheld dismissal or summary judgment in cases where a plaintiff has failed to raise an administrative discrimination complaint in a timely manner. *See, e.g., Baldwin County Welcome Center v. Brown*, 466 U.S. 147 (1984); *United Airlines, Inc. v. Evans*, 431 U.S. 553 (1977).

When Obas filed his administrative "formal complaint of discrimination," he alleged that the DEA discriminated against him only on the basis of his Haitian national origin. Govt. Exh. 16. Notably, Obas did not reference his race or any prior protected EEO activity; in fact, he declined to check the boxes marked "race or color discrimination" and "reprisal" on the form provided to him. *Id.* There is no record of any effort on the part of

11

Obas or his attorney to amend his administrative complaint; thus, the administrative process that ensued addressed a single claim – national origin discrimination.  Neither the DEA's administrative investigation nor the EEOC proceedings addressed race discrimination or retaliation.  Govt. Exh. 17-18.

Obas's administrative complaint and the subsequent investigation and EEOC proceedings established the parameters of what he may assert in his judicial complaint. Generally speaking, it is this initial complaint that defines the scope of an aggrieved employee's subsequent right to institute a civil suit. *See Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir.1996).  The claims the employee may raise in a subsequent civil action are limited to those that are "reasonably related to" his or her administrative charge and can be expected to follow from a reasonable administrative investigation."  *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247-48 (4th Cir.2000); *Chisholm v. United States Postal Serv.*, 665 F.2d 482, 491 (4th Cir.1981). Even construing Obas's administrative complaint and his judicial complaint liberally, it cannot be said that an investigation into race discrimination or retaliation is "reasonably related to" or "expected to follow from" an investigation into gender discrimination, age discrimination, and reprisal.  *See Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002) (holding that claims of color discrimination, sex discrimination and retaliation are not reasonably related to or expected to follow from a race discrimination charge).  Thus, to the extent Obas's judicial complaint asserts claims of race discrimination and retaliation, the Court should dismiss those claims, or grant the DEA

summary judgment with respect to them.  Should the Court decline to do so, the arguments raised in Section II, below, which pertain to Obas's national origin discrimination claim, apply equally to any race discrimination or retaliation claim, and warrant granting summary judgment on those claims as well.

## II. NATIONAL ORIGIN DISCRIMINATION

The gravamen of Obas's lawsuit is his claim that he was non-selected for the vacant GS-14 position because of his Haitian national origin.  The DEA is entitled to summary judgment on this count because Obas cannot rebut the DEA officials' legitimate explanation for why he was not selected.  Whether the Court focuses on SAC Jerome Harris's decision not to recommend Obas for the position, the Career Board's decision to recommend another qualified candidate, or Deputy Administrator Michele Leonhart's decision to endorse the Career Board's recommendation, the result is the same: each decision maker has articulated legitimate reasons that Obas cannot rebut.  Granting summary judgment in the DEA's favor is therefore appropriate.

### A.   Summary Judgment Standard

According to Fed. R. Civ. P. 56, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As here, where the non-moving party will bear the burden of proof at trial, the movant's obligation in the summary judgment context is satisfied upon a showing that there is a lack of evidence to carry the

non-moving party's burden on an essential element of that party's cause of action.  *See*
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Cray Comm., Inc. v. Novatel*
*Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994).  Once the movant does so, the
party opposing summary judgment must "set forth specific facts showing that there is a
genuine issue for trial."  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 323.  The party
opposing the motion may not rely on the pleadings or unsupported speculation, but
instead must come forward with specific material evidentiary facts.  *Ash v. United Parcel*
*Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  In this regard, a fact is "material" only
if it might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986).  Moreover, the non-movant cannot avoid summary judgment by establishing
"[t]he mere existence of a scintilla of evidence in support" of his position; to the contrary,
he must proffer "evidence on which the jury could reasonably find for the plaintiff."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251-52.

### B.    Burdens of Proof and Persuasion in Title VII Cases

Disparate treatment claims are analyzed using the familiar burden-shifting scheme
established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Hill v.*
*Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir.2004) (en banc).
Under *McDonnell Douglas*, a plaintiff-employee must first establish a *prima facie*
disparate treatment case.  To do so, he must show: (1) he belongs to a protected class; (2)
he suffered an adverse employment action; (3) he was performing his job duties at a level
that met the employer's legitimate expectations at the time of the adverse action; and (4) a

similarly situated person outside his protected class received more favorable treatment. *Baqir v. Principi*, 434 F.3d 733, 741 (4th Cir. 2006); *White v. BFI Waste Services, LLC*, 375 F.3d 288, 295 (4th Cir. 2004).  If the plaintiff can establish a *prima facie* discrimination case, the burden of production (not proof or persuasion) shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the personnel action.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant-employer meets its burden of production, the plaintiff must then prove, by a preponderance of the evidence, that the defendant's articulated reasons are a pretext for discrimination.  *Id.*

### C.   Obas Cannot Rebut the DEA's Legitimate Reasons for its Decisions

Applying the standards described above to the facts established in the extensive administrative record shows that Obas cannot overcome the DEA's motion for summary judgment.  Even assuming (for purposes of this motion only) that Obas can establish a *prima facie* national origin discrimination claim, the DEA has articulated legitimate, non-discriminatory reasons that Obas cannot rebut.  In employment discrimination cases such as this, in which agency officials make recommendations to other agency officials who act upon those recommendations, the discussion often turns to who the true decision maker is.  For in this circuit, to survive summary judgment, a plaintiff-employee must come forward with evidence that the individual (or individuals) "principally responsible" for the employment at issue were motivated by discrimination.  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d at 291.  In this case, the DEA could argue that the

decision maker is the deciding official – Deputy Administrator Leonhart.  The DEA could also assert that the Court should focus on the Career Board as a whole, as they collectively made a recommendation to Leonhart.  Obas, in response, could argue that Harris's decision not to include Obas among the top recommended candidates was tantamount to a non-selection, and that the Court should focus on his motives.  But engaging in such back-and-forth would be a mere academic exercise in this case because at each level the DEA has articulated legitimate, non-discriminatory reasons for its actions.  These are discussed in turn.

### 1.  SAC Harris's Recommendation Memo

As the SAC of the office in which the vacancy at issue here occurred, Harris was charged with reviewing the applicants who made the BQL, and providing to the Career Board a list of his top-recommended candidates, detailing the reasons why they would be suitable for the position.  Govt. Exh. 1, p. 4.  In a memorandum to the Career Board, Harris listed two applicants as his top choices and provided a detailed description of them vis-à-vis eight job-related criteria.  Govt. Exh. 1, Att. E.  As described above, Harris's narrative on Dinnall, the top-recommended candidate for the position, included concrete examples of Dinnall's leadership abilities, investigative expertise, interpersonal skills, etc. Govt. Exh. 1, Att. E, pp. 1-4.  Harris did not rely merely on his own personal experience in reviewing Dinnall's qualifications; he drew many examples from Dinnall's immediate supervisor, Country Attaché Ranaldo Ollie.  *Id.*  Harris also relied on information gathered by his own ASAC, Jay Bergman, who interviewed the applicants and their

16

supervisors, and compiled data gathered into a draft memorandum.  Govt. Exh. 7, p. 2.

Harris's analysis of Eric Friedman, his second choice, was equally detailed and thorough.

Govt. Exh. 1, Att. E, pp. 5-7.

Harris was just as clear when, during the administrative EEO investigation, he

described why he did not find it appropriate to recommend Obas for the position.  Govt.

Exh. 6, p. 2.  Specifically, Obas's involvement in fighting with another DEA agent in

front of a host nation counterpart made Harris reluctant to recommend Obas for a position

with greater responsibility and supervisory authority.  *Id.*  Obviously, on-the-job

misconduct is a legitimate reason for an employment action.  *Walton v. City of Manassas*,

162 F.3d 1158, *1 (4th Cir. 1998) (Table); *see also Halperin v. Abacus Technology

Corp.*, 128 F.3d 191, 201 (4th Cir. 1997), *abrogated on other grounds, Baird ex rel.

Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999).  It is undisputed that Obas received a letter

of reprimand for the incident – Obas admitted as much in his deposition.  Govt. Exh. 4, p.

3.  But although Obas does not dispute that the fight occurred, he asserts that he was

attacked by the other agent.  See Govt. Exh. 3, pp. 58-62.  This is irrelevant, however, for

the pertinent inquiry is not whether the Obas was guilty of misconduct, but whether

Harris legitimately believed that Obas had been involved in misconduct.  *Garrett v.

Langley Federal Credit Union*, 121 F. Supp. 2d 887, 901 (E.D. Va. 2000) (citing *Elrod v.

Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991).  Moreover, regardless of

how the fight began, Harris wanted Obas "to develop leadership through positive actions

and behavior," and believed that it was inappropriate to recommend him for a supervisory

17

position when his misconduct had occurred on duty.  Govt. Exh. 6, p. 2.  Thus, Obas

cannot escape summary judgment by offering his version of what transpired during his

altercation with the other agent.

As the DEA has articulated a legitimate reason why SAC Harris recommended

Dinnall and Friedman, but not Obas, the burden shifts to Obas to show pretext.  On this

score, a "plaintiff alleging a failure to promote can prove pretext by showing that he was

better qualified, or by amassing circumstantial evidence that otherwise undermines the

credibility of the employer's stated reasons."  *Heiko v. Colombo Sav. Bank*, 434 F.3d 249,

259 (4th Cir. 2006).  Obas cannot meet his burden of establishing either superior

qualifications or circumstantial evidence of national origin discrimination.

In attempting to show superior qualifications, "the burden is on [Obas] to establish

that [he] was the better qualified candidate for the promotion sought."  *Gairola v.*

*Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1287 (4th Cir. 1985) (citing *Young v.*

*Lehman*, 748 F.2d 194, 198 (4th Cir. 1984)).  In Obas's deposition testimony and in the

affidavits and exhibits he submitted during the administrative process, he primarily

focuses on his seniority over Dinnall (Obas entered the DEA approximately ten years

before Dinnall did),10 his language skills (Obas speaks French, Spanish, and Creole,

where Dinnall apparently is not fluent in any) and his diversity of experience in the DEA.

Govt. Exh. 3, pp. 34-36, 40-45; Govt. Exh. 4; Govt. Exh. 5.  Obas also touts his successes

---

10 On this score, while Obas focuses on the fact that Dinnall has only nine years experience in the
DEA, he ignores the fact that Dinnall served three years in the U.S. Army as a
Counterintelligence Agent, a position from which he undoubtedly brought useful skills to the

in various operations in the Caribbean and in Central America.  Govt. Exh. 5.  While these are no doubt significant, whether or not the plaintiff-employee himself believes he is more qualified for the position is not relevant to this Court's determination.  *See Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980).  "It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960-61. Thus, in evaluating Harris's decision not to include Obas on the short list, only Harris's perception is relevant.

Moreover, Obas is not free to pick and choose which qualifications are the most crucial to the GS-14 Group Supervisor position.  Obas "cannot establish [his] own criteria for judging [his] qualifications for the promotion. [He] must compete for the promotion based on the qualifications established by [his] employer." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 269 (4th Cir.2005).  Rather, to establish pretext, Obas must show that he was better suited for the position based on the qualifications established by the DEA.  Harris described Dinnall's qualifications vis-à-vis the eight established factors in his recommendation memo.  Govt. Exh. 1, Att. E.  Comparing Dinnall's qualities and experience as related to these factors to Obas's does not reveal that Obas was better suited for the position.  To the contrary, the fighting incident perhaps evidences that he is *ill-suited* to the position in light of some of the criteria.  Specifically, one would be hard-pressed to argue that engaging in a physical altercation with a colleague displays an ability to "[work] in a team environment of mutual cooperation and

---

DEA.  Govt. Exh. 1, Att. E, p. 1.

19

assistance."  Govt. Exh. 1, Att. E., p. 2.  And fighting with a fellow DEA special agent during an operation in front of a host nation counterpart is perhaps the farthest one can get from "building and maintaining coalitions with other persons or entities, both internal and external to the agency."  *Id.*, p. 3.  Further, Harris's testimony that he wanted a supervisor who could "develop leadership through positive actions and behavior," and that the fight illustrated to him that Obas was deficient in this regard, Govt. Exh. 6, p. 2, demonstrates that Obas was deficient in the "managing, motivating, mentoring and training subordinates" criteria.    Govt. Exh. 1, Att. E, p. 2.

Though Obas would rather the Court turn its attention from the altercation and instead focus on the years of seniority he had over Dinnall, doing so is not appropriate under this circuit's precedent.  In *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006), the Fourth Circuit noted that "in a suit alleging failure to promote, a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare [himself] to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."  It stands to reason that the converse is true – a plaintiff cannot ignore a single factor that was significant in the promotion decision.

Not only has Obas failed to establish superior qualifications, but he also cannot point to any circumstantial evidence that Harris's reasons were pretext.  Moreover, there is no evidence whatsoever in the administrative record from which a reasonable jury could conclude that Harris listed Dinnall and Friedman on his recommendation memo,

20

but omitted Obas, because of the latter's Haitian national origin.  Thus, Obas cannot show that the reasons underlying Harris's recommendation decision are pretext.

## 2.  __The Career Board's Recommendation__

The Career Board's collective decision to recommend Dinnall (rather than Obas or any of the other six applicants on the best-qualified list) is likewise supported by legitimate, non-discriminatory reasons.  The Career Board members considered each applicant's comparative qualifications, with the benefit of each applicant's biographical data sheet[11] and the SAC recommendation memo, and ultimately concluded that Dinnall was the best-qualified applicant for the position.  Govt. Exh. 1, p. 4; *see also* Govt. Exhs. 6, 10-14.  To be sure, the fact that Dinnall was the top-recommended candidate on the latter was an "important factor," as the SAC "would have been very familiar with the applicants and their qualifications for the position in question."  Govt. Exh. 9, p. 2.  Thus, it is unsurprising that the Career Board, based on the information before them, concluded that Dinnall was the best-qualified candidate for the position.

As "relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision," *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996), the burden now shifts to Obas to show pretext. *Heiko*, 434 F.3d at 259.  He must show either that he was better qualified, or that circumstantial evidence exists that shows that the Career Board decision was pretext.  *Id.*

---

11 As was stated above, the applicants' national origins are not identified in any of the materials that the Career Board considered.  Govt. Exh. 9, p. 2.

Obas and Dinnall's comparative qualifications were discussed in the preceding section, and that discussion will not be repeated here.  Moreover, there is no circumstantial evidence that the Career Board's reasoning for recommending Dinnall – that they found him to be the best-qualified candidate – was pretext.  Indeed, the evidence amassed in the administrative record shows that the decision to recommend Dinnall was just one of over 100 promotion and assignment matters the Career Board addressed that same day.  Govt. Exh. 9, p. 1.  There is simply nothing to suggest that the decision at issue here was out of the ordinary, much less a sham decision for which the six Career Board members who provided affidavits manufactured a reason for non-selecting Obas.  Thus, Obas cannot meet his burden of establishing pretext.

### 3. **The Deputy Administrator's Selection Decision**

Finally, focusing on Deputy Administrator Leonhart's decision to formally select Dinnall (and consequently "non-select" Obas) for the position reveals a familiar pattern: legitimate, non-discriminatory reasons for the decision, with not a hint of evidence to suggest pretext.  As Deputy Administrator, Leonhart was the Chairman of the Career Board, and was present during the December 15, 2004 meeting.  Govt. Exh. 9, p. 1. Leonhart did not know Obas, and was not even aware of his national origin at the time of the meeting.  *Id.*  As she stated in her affidavit, "the Career Board selected S/A Michael Dinnall for the position.  As Chairman of the Career Board, I am the final selecting authority, and I concurred in this decision."  *Id.*, p. 2.

Reliance on a selection panel's recommendation constitutes a legitimate, nondiscriminatory reason for making a selection decision. *Malghan v. Evans*, 118 Fed. Appx. 731, 732 (4th Cir. 2004); *Holdcraft v. County of Fairfax, VA*, 31 Fed. Appx. 97 (4th Cir. 2002). Moreover, it is a reason that Obas cannot rebut or show is pretext.

***

To summarize, whether the Court focuses on Harris's decision not to recommend Obas for the position, the Career Board's decision to recommend Dinnall, or Leonhart's decision to select Dinnall, the DEA has articulated legitimate, nondiscriminatory reasons at every level. Moreover, Obas cannot rebut these reasons, or show that they are pretext. Thus, the DEA is entitled to summary judgment on Obas's national origin discrimination claim.

///

///

23

## <u>CONCLUSION</u>

For the reasons stated above, the DEA respectfully requests that the Court conclude that Obas failed to exhaust his administrative remedies with respect to any race discrimination and retaliation claims he may be attempting to assert, and that the Court grant the DEA summary judgment with respect to the remaining national origin discrimination claim.

Respectfully submitted,

CHUCK ROSENBERG
UNITED STATES ATTORNEY

By _____/s_____
KEVIN J. MIKOLASHEK
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
Justin W. William United States
   Attorney's Building
2100 Jamieson Avenue
Alexandria, VA. 22314
Telephone:   (703) 299-3809
Fax:           (703) 299-3983
Kevin.mikolashek@usdoj.gov
*Counsel for the Defendant*

OF COUNSEL:
Alysia A. Cuilwik, Esq.
Office of Chief Counsel
Drug Enforcement Administration

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of August, 2008, I will electronically file

the foregoing with the Clerk of Court using the CM/ECF system, and will mail the

document by U.S. mail to the following non-filing user:

    Mark J. Berkowitz, Esq.
    Interstate Centre I
    1620 W. Oakland Park Blvd, Suite 300
    Fort Lauderdale, Florida 33311
    Tel: (954) 527-0570
    Fax: (954) 523-5893
    Mjb2157@aol.com

                _____/s_____
                Kevin J. Mikolashek
                Assistant United States Attorney
                UNITED STATES ATTORNEY'S OFFICE
                Justin W. Williams U.S. Attorney Building
                2100 Jamieson Avenue
                Alexandria, Virginia  22314
                Ph:  (703) 299-3809
                Fax: (703) 299-3983
                kevin.mikolashek@usdoj.gov
                *Counsel for the Defendant*

COPY FURNISHED:
Alysia A. Cuilwik, Esq.
Office of Chief Counsel
Drug Enforcement Administration